## SAFETY FUMIGANT CO. v. UNITED STATES.

### No. 46364.

United States Court of Claims.

June 5, 1950.

Prentice E. Edrington, Washington, D. C., for the plaintiff.

T. Hayward Brown, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for the defendant. E. R. Weisbender, Washington, D. C., was on the brief.

Plaintiff brought this suit to recover just compensation for the alleged unauthorized use by defendant of U. S. Patent No. 1,991,938 for "Volatile Fumigant Package." It is alleged that certain packaged fumigants, more particularly described in the findings, containing methyl bromide manufactured for and used by the United States from 1939 to 1945, for the fumigation of the clothing of military and other personnel, infringed claim 4 of the patent.

Special Findings of Fact

1. This is a patent suit alleging infringement of United States letters patent No. 1,991,938 granted February 19, 1935, on an application therefor filed by Harry W. Houghton on April 5, 1926. The title of the patent is "Volatile Fumigant Package". A copy of the patent in suit, plaintiff's exhibit 1, and a copy of the Patent Office proceedings leading to its grant, plaintiff's exhibit 2, are made a part of this finding by reference. The petition in this case was filed March 15, 1945.

2. The plaintiff in this case, Safety Fumigant Company, is a corporation organized and existing under the laws of the State of Massachusetts.

3. On January 19, 1935, Harry W. Houghton assigned the entire right, title and interest in his application Serial No. 99,955 filed April 5, 1926, which ultimately resulted in the patent in suit, to the plaintiff herein, Safety Fumigant Company, a corporation of Massachusetts. The title of the patent in suit is in the plaintiff.

Fumigants

4. From a generic standpoint, a fumigant may be defined as a substance that emits fumes. The various substances used for the purposes of fumigation[1] are generally volatile in nature, and it is usually necessary to keep them in a closed container to preserve them. Substances such as volatile perfumes, smelling salts, aromatic spirits of ammonia, cyanogen gas, and methyl bromide are familiar examples of fumigants. The two latter examples cited are also referred to as insecticides as they are fumigant gases highly poisonous to insects and their eggs. Cyanogen gas and compounds are extremely poisonous to humans and therefore dangerous to handle. More than momentary exposure to a dosage of hydrocyanic acid of four-tenths of an ounce (equivalent to 11.84 cubic centimeters) released in an average size room of 12 ft. by 15 ft. by 8½ ft. would be dangerous.

Methyl bromide is not a dangerous fumigant in the sense that hydrocyanic acid is. This is particularly true in the amounts used in the alleged infringing structures. A person can tolerate rather high concentrations for a short period or medium or low concentrations for a relatively long period.[2]

5. Insecticides of this nature may be packaged in the form of a glass ampule containing the gas in liquid form which becomes gaseous when the ampule is broken. Hydrocyanic acid boils at a temperature of 77° F. and cyanogen chloride boils at a temperature of 59° F. A mixture of these two will have an intermediate boiling point depending upon the relative quantities present. Methyl bromide boils at a temperature of 40° F. These boiling points are given at atmospheric pressure

---

[1]. Fumigation: 1. Act of making or using fumes or perfume, as in incantation. 2. Act of fumigating; exposure to fumes, as for disinfection. 3. Vapor raised in the process of fumigating; also, a preparation used for fumigating purposes. (Webster's New International Dictionary, 1934.)

[2]. During the trial of this case 20 cubic centimeters of liquid methyl bromide were instantaneously vaporized within six feet of the commissioner in his office and shortly subsequent thereto four additional ampules of methyl bromide, each containing 20 cubic centimeters, were broken in the hearing room, and there were no apparent ill effects upon any of those present.

and these substances when enclosed in hermetically sealed containers will remain in a liquid state although the temperature external to the containers may be above the boiling points.

When the containers or ampules are broken, the released liquid upon contact with the air quickly absorbs the heat in the air surrounding it, resulting in the liquid's volatilizing rapidly into gas. Thus, at an ordinary room temperature of 72° F. hydrocyanic acid would evaporate rather rapidly while methyl bromide with a boiling point of 40° F. would volatilize into methyl bromide gas almost instantaneously.

6. In the use of insecticides it is necessary (a) to provide a sufficient concentration of the fumigant per cubic foot of the space utilized to produce a lethal dose for the insects and their eggs, and (b) a sufficient time interval for the fumigant to suitably penetrate the clothing or other material containing the insects and eggs, and for absorption of the fumigant by the insects and eggs. Both quantity of fumigant and time of exposure are thus involved.

An ideal condition would be represented by a hermetically sealed or impervious enclosure in which clothing or other materials could be placed, together with the speedy release or volatilization of the fumigant used so that a lethal concentration could be attained in the receptacle as soon as possible, thereby reducing the total duration of the fumigation process.

In numerous instances it is impracticable or impossible to use an airtight receptacle for fumigation purposes. Such a situation would be exemplified by the fumigation of a room, closet, or a partially pervious container, in all of which leakage would occur. It is conventional procedure to provide an excess amount of fumigant for such contingency. This may be done either by the release of an extra quantity of fumigant at the beginning of the fumigation process or by releasing additional fumigant at intervals during the fumigation process. It is immaterial which method is used as long as sufficient fumigant is volatilized to maintain a lethal dose for the necessary period of exposure.

### The Patent in Suit

7. The introductory statement of the specification describes the invention in the following phraseology:

"This invention relates to means for distributing gaseous or volatile substances, particularly such as are of a poisonous nature, intended for use as fumigants, insecticides, germicides, etc., commonly containing hydrocyanic acid gas or other cyanogen compounds in gaseous or liquid form. The invention aims to provide a safe and inexpensive package of convenient size for ordinary domestic use, and which may be transported and sold without special precautions against accident."

Fig. 1 of the patent, which shows the preferred embodiment selected for the purpose of illustration, is reproduced herewith. As disclosed and described in the specification, this consists of an elongated sealed glass tube or ampule 11 containing a fumigant in liquid form. This ampule is provided at its middle with a reduced or constricted portion 12 that may be readily fractured to permit the escape of the fluid contents. The specification describes the

Figure 1 of the patent in suit

enclosed fumigant liquid as preferably a gaseous combine containing hydrocyanic acid and cyanogen chloride, or the like, absorbed in a liquid or mixture of liquids. In this connection, the specification states:

"* * * the invention is not restricted to these particular gases and materials, as it is evident that the principle applies to packaging any gas emitting substances or gas that can be handled only with difficulty or danger."

The glass ampule is surrounded with a diffusing and vaporizing medium 14 stated to be of absorbent cotton or other material permeable to gas and interposing a substantial resistance to the free flowing away of the liquid contents when the container is broken open. The patentee defines the term "diffusing element" as follows:

"The term 'diffusing element' as herein employed is intended to embrace any medium that is adapted and arranged to receive and act upon the contents as it issues from the container and prepare it for liberation of the gas gradually or assist in the liberation of the gas."

The specification suggests that this material may be wrapped with a few layers of gauze bandage or other suitable material for holding it in close contact with the tube. This, in turn, is covered with a varnished or treated fabric or glazed paper or other moistureproof material 16, stated to be "tightly wrapped around the outside." The ends of the wrapper or covering are held by eyelets 17 which have perforated centers which permit the gas to escape from within the package.

The manner of use and the purpose and intent of the invention are described in the following phraseology:

"Assuming the tube to be filled with a suitable fumigant in solution, the neck 12 of the tube is fractured by a smart blow, and the liquid seeps out into the diffusing absorbent material, where it volatilizes in due course, the gas or vapor finding its way out through the ends of the package or wherever the perforated eyelets 17 or equivalent means are located. The length of time required for the gas to find its way out is sufficient to permit the user to leave the vicinity in advance of the escape of the fumes."

8. The diffusing medium surrounding the ampule will slow down the evolution of gas when the ampule is broken because of the following action:

The fibers of the cotton or other diffusing medium form numerous small interstices through which the fumigant fluid first has to permeate or seep, thus contributing a time interval before the fumes escape. (See last phrase in claim 4, next finding.) After the diffusing medium has become saturated with the fumigant fluid, it will act as a wick, thereby controlling the rate of evolution of the gas. When a liquid evaporates it tends to absorb heat from the surrounding medium or atmosphere. The heat-insulating property of the diffusing medium therefore also contributes to a slow rate of gas evolution.

The outer cover is varnished or rendered moistureproof and thus forms a liquidproof or gas-proof covering which also restricts the evolution of gas by holding the liquid contents of the broken ampule within the absorbent layer and allowing it to evaporate only from the relatively small areas of the apertures at the ends of the package.

9. The single claim in suit is claim 4, as follows:

"4. A fumigant gas liberating device consisting of a container having a breakable portion, a body of liquid of a character to give off fumigant gas within said container, and a covering surrounding said container comprising a diffusing medium permeable to gas and arranged to receive said liquid when said breakable portion is broken, said covering interposing a substantial resistance to the free flowing away of said liquid when said breakable portion is broken and providing a path for restricted flow of the fumigant gas to the outer air so that after breaking of said breakable portion a substantial length of time intervenes before the escape of the fumigant gas from the device."

10. The meaning of the words "a substantial length of time" included in the

closing phraseology of the above-quoted claim in the previous finding, is not indefinite when interpreted by the specification of the patent in suit. This phrase means to those skilled in the art a sufficient length of time to escape from exposure to a dangerous fumigant gas. To an operator using hydrocyanic acid to fumigate an average size room, 12 ft. by 15 ft. by 8½ ft., this would mean a safety period of approximately two minutes in which to leave the room after a fumigating ampule had been broken, the two-minute period giving a margin of safety to allow for such contingencies as falling over a chair, etc.

If the device disclosed in the patent in suit were utilized and the gas was liberated gradually enough to prevent a concentration of gas dangerous to human life in this size room in less than two minutes (volatilization of four-tenths of an ounce of hydrocyanic acid), it would take approximately sixty minutes at this same rate of egress for the complete escape of the total amount of fumigant (12½ ounces of hydrocyanic acid) necessary for the fumigation of a room this size.

11. From the date of issuance of the patent in suit until September 20, 1948, when hearings were begun in this case, neither plaintiff nor its assignor, Harry W. Houghton, ever manufactured, used or sold any devices made in accordance with the teachings of the patent notwithstanding the fact that the plaintiff company is engaged in the fumigation business. It does not appear that any licenses were ever granted under the patent in suit.

### The Alleged Infringing Structure

12. During the six-year period prior to March 15, 1945, the date of filing of the petition in the present suit, the Government, without the license or consent of the plaintiff, had manufactured for it and used within the United States fumigant gas-liberating devices for the fumigation of the clothing of military and other personnel. Such fumigation was to exterminate body lice or "cooties" and their unhatched eggs, and such other vermin as might be present.

The method employed was, in brief, to have the individual remove all clothing, which was then enclosed in a fumigation bag into which an ampule containing a fumigant material was placed. The ampule was then broken, releasing the fumigant gas. After a 45-minute exposure at ordinary temperatures the clothing was removed from the bag, shaken out, and donned by the individual. The bag was then immediately reused by another infected person. Time was of the essence in this operation as a relatively large number of individuals were usually involved in this process.

13. The delousing bag used by defendant was made of synthetic rubber and was approximately 2 feet wide by 5 feet long. Such a bag is in evidence as defendant's physical exhibit 10. After the clothing had been placed in this bag, the top was folded over three times to make a reasonably gas-tight closure and tied by means of tapes attached to the bag.

A pocket, both ends of which were open, was located inside the bag and on one side thereof. The fumigant cartridge or ampule was placed within this pocket and the bag then closed and tied. The ampule was then broken either by means of a stick or by stepping on it as the bag lay on its side.

14. The fumigant used by the defendant was methyl bromide. Although fifteen cubic centimeters of this were sufficient to produce an effective kill with the bag used, twenty cubic centimeters were enclosed in a pyrex glass ampule approximately 5½" long and ⅞" in diameter. This ampule was of uniform diameter with the exception of the ends, one of which was rounded, and the other tapered to a point where it had been sealed during manufacture. The ampules had no restricted or breakable portion as such and those that were demonstrated during the trial of this case broke into numerous fragments.

The ampule was enclosed in a bag made of a single thickness of Canton flannel of sufficient size to loosely fit the ampule. The primary purpose of this bag was to retain the glass fragments when the ampule was broken and to prevent them from becoming mixed with the clothing in the fumigation bag. In addition, the Canton flannel bag served as a protective covering for the ampule for preventing accident-

al breakage, and also as an absorbent to prevent immediate spilling of the liquid contents of the ampule when it was broken.

15. The ampule and its Canton flannel bag were enclosed in a rectangular, thin, unglazed cardboard carton approximately 6" long and having a width and breadth of approximately 1⅛". This carton was similar to those normally used for the packaging of tubes of toothpaste, shaving material and the like.

The ends of the carton were closed in the customary manner by the folding over of three tabs at each end thereof. Two opposite tabs were approximately 1" in length and were folded down across the end of the carton and the third, or mid tab, was approximately 2" in length and after being folded over the two shorter tabs had its longer end folded and tucked into the end of the carton between the carton proper and the other two folded tabs. Both ends of the carton were closed in the same manner and no glue or adhesive was applied to the tabs to provide a sealed carton.

The purpose of the carton was to provide additional protection against accidental breakage of the ampule, convenience for group-packing a number of the ampules, and for providing a surface upon which instructions for use were printed, as well as additional protection from such fragments of glass as might possibly penetrate the flannel bag.

16. When the ampule is broken, a flash volatilization first takes place because of the relatively low boiling point of the methyl bromide (40° F.) as compared to ordinary atmospheric temperatures. This causes an explosive effect which blows open both the folded ends of the carton, permitting the gas evolved from the ampule to freely pass out of the carton and out of the two open ends of the retaining pocket in the bag.

The methyl bromide first volatilized exerts a cooling effect upon the remainder, thus preventing complete flash volatilization. The cloth bag surrounding the ampule, the side walls of the cardboard carton around the cloth bag, and the walls of the pocket in the fumigation bag all have some effect on the rate at which external heat is supplied to the methyl bromide to effect complete volatilization.

17. An inter-parties' test was conducted by plaintiff's expert with the defendant's alleged infringing device. An ampule enclosed in a carton was placed on a chemical balance and broken at ordinary room temperature and the following data obtained by the loss-of-weight method:

| Time | Percent volatilized | Quantity volatilized |
|------|---------------------|----------------------|
| | | *Cc's.* |
| 30 seconds | 43 | 8.53 |
| 1½ minutes | 50 | 10.13 |
| 3½ minutes | 68 | 13.6 |
| 5 minutes | 76 | 15.2 |
| 8 minutes | 90 | 18.13 |
| 12 minutes | 100 | 20 |

The alleged infringing structure used by the Government volatilized 43 percent of the methyl bromide in 30 seconds, and in 5 minutes volatilized a sufficient amount of fumigant for an effective kill. The entire contents of the ampule volatilized in 12 minutes. The defendant's structure is exemplified by plaintiff's physical exhibits 4 and 6.

### Prior Art and Knowledge

18. The following patents were available to those skilled in the art prior to April 5, 1926, the filing date of the patent application which matured into the patent in suit:

British patent to Hartridge No. 28,302 of 1913 (defendant's exhibit 2)

British patent to Newman No. 19,058 of 1913 (defendant's exhibit 3)

British patent to Imray No. 119,126 accepted September 26, 1918 (defendant's exhibit 4)

British patent to Thackray No. 124,290, accepted March 25, 1919 (defendant's exhibit 5)

British patent to O'Donnell No. 210,017, accepted January 31, 1924 (defendant's exhibit 6)

United States patent to Tuttle No. 1,131,-575 granted March 9, 1915 (defendant's exhibit 7)

In addition to the above there were available to those skilled in the art the patents and publications cited by the Examiner of the Patent Office during the course of the prosecution of the application which matured into the patent in suit, as follows:

United States patent to Jarrett No. 1,332,985, granted March 9, 1920 (defendant's exhibit 9-A)

United States patent to Norton No. 1,516,454, granted November 18, 1924 (defendant's exhibit 9-B)

United States patent to Harry W. Houghton No. 1,521,537, granted December 30, 1924 (defendant's exhibit 9-C)

United States patent to Christmann No. 1,620,074, application filed August 3, 1925, granted March 8, 1927 (defendant's exhibit 9-D)

British patent to Whatmough No. 1531, of 1915, accepted December 30, 1915 (defendant's exhibit 9-E)

Publication entitled "Handbook of Pharmacy & Therapeutics" by Eli Lilly, published in the year 1919 (defendant's exhibit 9-F)

Publication in the form of United States Department of Agriculture Bulletin No. 1313, published January 26, 1925 (defendant's exhibit 9-G)

Prior knowledge is exemplified by United States patent to Mock No. 1,648,657 (defendant's exhibit 8) granted November 8, 1927 on an application filed July 26, 1924, prior to April 5, 1926, the filing date of the patent application which matured into the patent in suit.

The above-enumerated exhibits are made a part of this finding by reference.

19. United States patent to Mock, Fig. 1 of which is reproduced herewith, discloses the same basic principles involved in the defendant's process of fumigation. This patent, which deals with moth fumigation, discloses a receptacle consisting of a bag in which clothing is placed. The bag is provided with a pocket near its opening into which is inserted a sealed glass vial or ampule containing a gas or liquid whose vapor is fatal to moths. The bag is then closed by having its ends folded over and the ampule then crushed, allowing the fumigant to escape into the

Figure 1 of the Mock patent

body of the bag and to fumigate the contents thereof.

20. United States patent to Norton (defendant's exhibit 9-B) relates to ampules of the ammonia inhalant type. As shown in Figs. 1 and 3 of this patent reproduced herewith, the liquid is held in a glass container or ampule confined in a protective cover. The patent states with respect to these covers that they "necessarily encase the containers completely so as to prevent scattering of the fragments and cutting of the fingers when the container is

broken to release its contents." The ampule is stated to be made of glass tubing cut into proper lengths and sealed at both

ends, and the covering is stated to consist of a soft resilient envelope of coiler cotton enclosed in silk mesh which is suitably tied over the ends of the tube. These items are referred to in the claims as "an absorbent protective cover."

When the ampule is crushed, the liquid is absorbed by the covering and volatilizes therefrom. The absorbent covering acts as a diffusing medium and would obviously have the effect of controlling the rate of evaporation of the ammonia or any other volatile liquid that those skilled in the art might desire to use. This controlling effect would be dependent upon the thickness of the absorbent covering selected by those skilled in the art.

21. British patent to Thackray (defendant's exhibit 5) discloses substantially the same structure set forth in the previous finding. The invention is said to relate to a new and improved surgical dressing, particularly for applying iodine solution or other substance. Such substance is contained within a glass ampule which has a restricted or breakable portion. This ampule as disclosed is completely covered with a layer of cotton wool and it is, in turn, stated to be enclosed by a layer of gauze or other appropriate fabric. The patent suggests that the fastening employed around the restricted portion may be colored to indicate the point at which the ampule should be broken.

22. British patent to Hartridge (defendant's exhibit 2) discloses a volatile liquid-containing, breakable ampule, surrounded with cotton wool or the like, forming a protector against broken glass, the whole being covered with silk, cotton, or other fabric. When used, the ampule is broken and the liquid contents are absorbed in the wrapping which permits the volatile constituents to evaporate. The receptacle of the Hartridge patent is primarily intended as a device for holding perfumes and making them available for evaporation when needed.

23. British patent to O'Donnell (defendant's exhibit 6) is said to relate to improvements in distributor containers for holding and diffusing disinfectants, deodorants and the like. It describes to those skilled in the art prior devices in the following phraseology:

"Devices have been heretofore proposed for attaining the above object and such devices have comprised an impervious receptacle or receptacles of glass, rubber, gelatine, isinglass, or other suitable material which when required, may be fractured or punctured, thereby releasing a charge of some volatile agent or compound within said receptacle or receptacles on to an outer wrapper of paper or other absorbent material which forms a protector to the receptacle or receptacles in the first place, and a diffuser for the contents when the container is fractured or punctured."

The specific disclosure of this British patent is a thin metal receptacle filled with a volatile disinfecting or deodorizing agent in liquid form enclosed in a protective covering or fabric of an absorbent nature. The thin metal tube is intended to be punctured by a sharp-pointed instrument such as a pin or needle and the contents permitted to diffuse through the outer covering.

24. Summarizing the teachings of the prior art and knowledge, it is old to provide breakable glass ampules for fumigants and to enclose such ampules in an outer covering to prevent damage from the broken glass when the ampule is broken, and in addition, to function as a diffusing medium which becomes permeated with the fumigant and from which it volatilizes. The thickness or amount of covering on an ampule will enter into the control of the rate of diffusion. To make such covering thick or thin would be a matter of common knowledge and would be well within the knowledge of those skilled in the art.

As disclosed by the Mock patent, the method of killing insects in a fumigant bag by means of a fumigant contained in a glass ampule was known prior to the filing of the patent application resulting in the patent in suit. To merely add to the Mock disclosure a protective covering to the ampule of fumigant employed so as to retain the glass fragments would be within the knowledge of those skilled in the art, in view of the disclosure of such coverings, as set forth in the previous findings.

Claim 4 of the patent in suit is directed to an ampule having (a) a breakable portion, this breakable portion being shown as located in the central section of the ampule; (b) a covering interposing a substantial resistance to the free flowing away of the liquid and providing a path for restricted flow of the fumigant gas to the outer air so that after breaking the ampule a substantial length of time intervenes before the escape of the fumigant gas from the device. This latter element is disclosed in the specification as a tightly wrapped layer of cotton inside a cover having small apertures or eyelets at the ends to restrict the flow of the fumigant gas to the outer air.

The defendant's fumigant ampule has no breakable portion as such. It has no covering interposing a substantial resistance to the free flowing away of liquid when the ampule is broken, and it has no structure providing a path for the restricted flow of fumigant gas to the outer air so that, after breaking, a substantial length of time intervenes before the escape of the fumigant gas from the device.

On the contrary, when the alleged infringing structure is used in its intended manner for the fumigation of clothing of military personnel, time is of the essence, and the loosely fitting single layer of Canton flannel surrounding the ampule is for the primary purpose of containing the glass fragments, and does not cause any substantial delay in escape of the gas. The same is true with respect to the pasteboard carton, the ends of which are blown open by the gas pressure.

25. Claim 4, when interpreted in the light of the disclosure contained in the specification of the patent in suit and the purpose as stated, is not infringed by the Government devices.

26. If Claim 4 is construed as applicable to the alleged infringing structure, this claim is anticipated by the Mock patent in connection with the prior art patents disclosing glass fumigant ampules with a breakable portion and provided with a protective diffusing cover, and is invalid.

## Conclusion of Law

Upon the foregoing special findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is therefore dismissed.

Judgment is rendered against plaintiff for the cost of printing the record herein, the amount thereof to be entered by the clerk and collected by him according to law.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

940

LITTLETON, Judge.

The plaintiff sues to recover reasonable and entire compensation for the unauthorized use by the defendant of a fumigant package which it is alleged infringed claim 4 of the patent in suit, on the ground that the device covered by the patent and the alleged infringing device used by defendant function and operate in substantially the same manner and both produce substantially the same results. Claim 4 of the patent reads as follows:

"4. A fumigant gas liberating device consisting of a container having a breakable portion, a body of liquid of a character to give off fumigant gas within said container, and a covering surrounding said container comprising a diffusing medium permeable to gas and arranged to receive said liquid when said breakable portion is broken, said covering interposing a substantial resistance to the free flowing away of said liquid when said breakable portion is broken and providing a path for restricted flow of the fumigant gas to the outer air so that after breaking of said breakable portion a substantial length of time intervenes before the escape of the fumigant gas from the device."

A preferred embodiment (Fig. 1, Finding 7) selected by the patentee for illustration comprises a sealed glass tube containing a volatile fumigant in liquid form; the glass tube being provided with a breakable portion of reduced cross-section that may be readily fractured at the middle of the tube to permit the escape of the fluid contents. The specification describes the fumigant contained in the glass tube or receptacle as preferably a gaseous combine containing hydrocyanic acid and cyanogen chloride, or the like, absorbed in a liquid or mixture of liquids. The patent contemplates that the fumigant receptacle may be made of any suitable material other than glass, such as metal. The specification of the patent states that "the invention is not restricted to these particular gases and materials, as it is evident that the principle applies to packaging any gas emitting substances or gas that can be handled only with difficulty or danger." The glass ampule shown in

Fig. 1 of the patent is surrounded with a diffusing and vaporizing medium stated in the specification to be of absorbent cotton or other material permeable to gas and interposing a substantial resistance to the free flowing away of the liquid contents when the container is broken. The patentee defines the term "diffusing element," as follows:

"The term diffusing 'element' as herein employed is intended to embrace any medium that is adapted and arranged to receive and act upon the contents as it issues from the container and prepare it for liberation of the gas gradually or assist in the gradual liberation of the gas."

The specification of the patent suggests that this diffusing material may be wrapped with a few layers of gauze bandage or other suitable material for holding it in close contact with the tube containing the fumigant, and this, in turn, is shown to be covered with a varnished or treated fabric or glazed paper or moistureproof material "tightly wrapped around the outside." The ends of this wrapper or covering are held by eyelets having perforated centers which permit the gas to escape from within the package when the glass container is broken. The specification describes the invention as follows:

"This invention relates to means for distributing gaseous or volatile substances, particularly such as are of a poisonous nature, intended for use as fumigants, insecticides, germicides, etc., commonly containing hydrocyanic acid gas or other cyanogen compounds in gaseous or liquid form. The invention aims to provide a safe and inexpensive package of convenient size for ordinary domestic use, and which may be transported and sold without special precautions against accident."

The manner of use and the purpose and intent of the invention are described as follows:

"Assuming the tube to be filled with a suitable fumigant in solution, the neck 12 of the tube is fractured by a smart blow, and the liquid seeps out into the diffusing absorbent material, where it volatilizes in

due course, the gas or vapor finding its way out through the ends of the package or wherever the perforated eyelets 17 or equivalent means are located. The length of time required for the gas to find its way out is sufficient to permit the user to leave the vicinity in advance of the escape of the fumes.

During the six-year period prior to March 15, 1945, the date of filing of the petition in the present suit, the Government, without the license or consent of the plaintiff, had manufactured for it and used within the United States fumigant gas-liberating devices for the fumigation of the clothing of military and other personnel. Such fumigation was to exterminate body lice or "cooties" and their unhatched eggs, and such other vermin as might be present.

The method employed was, in brief, to have the individual remove all clothing, which was then enclosed in a fumigation bag into which an ampule containing a fumigant material was placed. The ampule was then broken, releasing the fumigant gas. After a 45-minute exposure at ordinary temperatures the clothing was removed from the bag, shaken out, and donned by the individual. The bag was then immediately reused by another infected person. Time was of the essence in this operation as a relatively large number of individuals were usually involved in this process.

The delousing bag used by defendant was made of synthetic rubber and was approximately 2 feet wide by 5 feet long. After the clothing had been placed in this bag, the top was folded over three times to make a reasonably gas-tight closure and tied by means of tapes attached to the bag.

A pocket, both ends of which were open, was located inside the bag and on one side thereof. The fumigant cartridge or ampule was placed within this pocket and the bag then closed and tied. The ampule was then broken either by means of a stick or by stepping on it as the bag lay on its side.

The fumigant used by the defendant was methyl bromide. Although fifteen cubic centimeters of this were sufficient to pro-

duce an effective kill with the bag used, twenty cubic centimeters were enclosed in a small pyrex glass ampule. This ampule was of uniform diameter with the exception of the ends, one of which was rounded, and the other tapered to a point where it had been sealed during manufacture. The ampules had no restricted or breakable portion as such.

The ampule was enclosed in a bag made of a single thickness of Canton flannel of sufficient size to loosely fit the ampule, the primary purpose of this bag being to retain the glass fragments when the ampule was broken and to prevent them from becoming mixed with the clothing in the fumigation bag. In addition, the Canton flannel bag served as a protective covering for the ampule for preventing accidental breakage, and also as an absorbent to prevent immediate spilling of the liquid contents of the ampule when it was broken.

The ampule and its Canton flannel bag were enclosed in a rectangular, thin, unglazed cardboard carton similar to those normally used for the packaging of tubes of toothpaste, shaving material and the like.

The ends of the carton were closed in the customary manner by the folding over of three tabs at each end thereof. Two opposite tabs were folded down across the end of the carton and the third, or mid tab, being folded over the two shorter tabs had its longer end folded and tucked into the end of the carton between the carton proper and the other two folded tabs. Both ends of the carton were closed in the same manner and no glue or adhesive was applied to the tabs to provide a sealed carton.

The purpose of this carton was to provide additional protection against accidental breakage of the ampule, convenience for group-packing a number of the ampules, and for providing a surface upon which instructions for use were printed, as well as additional protection from such fragments of glass as might possibly penetrate the flannel bag.

When the ampule is broken, a flash volatilization first takes place because of the

relatively low boiling point of the methyl bromide (40° F.) as compared to ordinary atmospheric temperatures. This causes an explosive effect which blows open both the folded ends of the carton, permitting the gas evolved from the ampule to freely pass out of the carton and out of the two open ends of the retaining pocket in the bag.

The methyl bromide first volatilized exerts a cooling effect upon the remainder, thus preventing complete flash volatilization. The cloth bag surrounding the ampule, the side walls of the cardboard carton around the cloth bag, and the walls of the pocket in the fumigation bag all have some effect on the rate at which external heat is supplied to the methyl bromide to effect complete volatilization.

Plaintiff contends that the apparatus manufactured and used by defendant infringes its patent in that such apparatus is made up of a combination of elements which are substantially the same or equivalents of the combination of elements claimed in claim 4 of the patent; that both the patent device and the alleged infringing device function and operate in substantially the same manner, and that both produce substantially the same beneficial results.

In view of what has been said above with reference to the structure, teaching, and result, intended to be accomplished by the patent in suit, and the structure and the result intended and produced by the device used by the defendant, we are of the opinion that the terminology of claim 4 of the patent in suit, when interpreted in the light of the disclosures contained in the specification of the patent, is not applicable to the structure used by the defendant, and that this claim has not, therefore, been infringed.

What plaintiff's assignor Houghton endeavored to patent was a container for a fumigant which was limited by the specification to a fumigant difficult and dangerous to handle, and the teaching of the patent is to have a container which will so restrict the escape of gas, after the ampule is bro-

ken, as to allow a sufficient length of time for the operator or user of the device to get away from the dangerous fumes. In this connection, among other things, the claim calls for a covering surrounding said container comprising a diffusing medium permeable to gas, and arranged to receive said liquid when said breakable portion is broken; said covering interposing *a substantial resistance* to the free flowing away of said liquid when said breakable portion is broken, and *providing a path for restricted flow of the fumigant gas to the outer air so that after breaking said breakable portion a substantial length of time intervenes before the escape of the fumigant gas from the device.* This is directly contrary to what the Government wanted. It is also contrary to the result produced by the Government's fumigant package. The intent of the Government's device was to get all gas out of the container as quickly as possible, and, as hereinbefore described, this alleged infringing device was so constructed as to accomplish this result and purpose.

In using a thin Canton flannel bag to retain the broken glass and a thin cardboard carton to provide protection against accidental breakage and for the other purposes hereinbefore mentioned, the Government was not following the teaching of the patent in suit, and the provision and use of these elements as parts of the defendant's fumigant package did not have the effect of producing the result called for by claim 4 of the plaintiff's patent.

In view of the facts established by the record and set forth in the findings it cannot be said that the alleged infringing device was substantially identical in structure, teaching, result, and purpose, with the device covered by claim 4 of the patent. We are of the opinion that everything the Government used in its fumigant package was disclosed in the British patent to O'Donnell, referred to in finding 23, and other patents described in findings 19 to 22, inclusive.

Plaintiff is not entitled to recover and its petition is dismissed. It is so ordered.